539 So.2d 173 (1988)
Michael D. LANGAN, et al.
v.
Jay P. ALTMAYER, et al.
86-1101.
Supreme Court of Alabama.
November 23, 1988.
Rehearing Denied January 13, 1989.
*174 G. Wayne Ashbee, Mobile, for appellants.
Michael D. Langan, pro se.
Charles R. Butler, Jr., and David A. Boyett III of Hamilton, Butler, Riddick, Tarlton & Sullivan, Mobile, for appellees.
Don Siegelman, Atty. Gen., and B. Frank Loeb and Ron Bowden, Asst. Attys. Gen., for amicus curiae State Dept. of Revenue.
BEATTY, Justice.
This appeal involves the right of former owners of property, which had been purchased by the State of Alabama at a tax sale for the nonpayment of ad valorem taxes, to redeem from the tax purchaser and his assigns.
The case grows out of a "bulk sale" by the State of the subject parcel and 316 other parcels, all located in Mobile County, pursuant to the "bulk sale" policy, which was adopted by the State Department of Revenue in 1982 to dispose of property held by the State for the nonpayment of taxes.
The central question presented is whether the former owners of the property, who are seeking to exercise their statutory right of redemption, must pay to the tax purchaser at the "bulk sale" a sum equal to "all the taxes due upon such lands, or for which they were sold, and the penalties and all of the taxes that should have been under the law assessed upon the same, if they had been the property of a private citizen of the state." Code of 1975, § 40-10-135.
In order to answer that central question, we must consider another question: Does Code of 1975, § 40-10-135, which allows the purchaser from the State to be "treated as an assignee" of all the taxes due on the property, plus the amount that would have accrued while the State held title, contravene Art. IV, § 100, Constitution of Ala. 1901, which generally prohibits the State from granting to a private individual the right to collect a tax?
On April 7, 1980, the Probate Court of Mobile County ordered the sale of the parcel of land involved on this appeal for the payment of taxes, fees, costs, and expenses of the state, county, and city. The land was offered for sale by the tax collector of Mobile County as provided for by law, and, no person having bid a sufficient sum to pay the taxes, fees, costs, and expenses, the land was bought by the State for the sum of the taxes, fees, costs, and expenses.
*175 In 1985, the State conducted a "bulk sale" of 317 parcels, including the subject parcel, in accordance with a policy adopted by the State to conduct county-wide sales of property it held title to for the nonpayment of taxes. In determining the amount of consideration to put into each individual deed, the State simply took the total purchase price of $27,500 and divided it by the total number of parcels, i.e., 317, to arrive at a consideration figure, which was recited in each deed$86.75. Admittedly, the consideration figure does not represent the sum of the delinquent taxes due or accrued while the State held title, nor does it represent the fair market value of any parcel. On January 3, 1986, the State land commissioner, with the approval of the Governor, executed a deed to Coastal Inter-City Health Services, Inc. ("Coastal"), which granted, bargained, sold, and conveyed all of the State's right and title to the subject parcel. On January 6, 1986, Coastal conveyed by a quit-claim deed all of its right, title, and interest in and to the subject property to Michael D. Langan and Mark A. Haynes, appellants, who subsequently conveyed, by quitclaim deed, a portion of the subject land to M & R Properties, Inc.
On September 3, 1986, plaintiffs, Jay P. Altmayer and 18 other individuals, in their personal or representative capacities as the original owners of the subject property, filed suit in the Mobile Circuit Court to quiet title to the property, and they also sought judicial redemption of the property. On March 30, 1987, the trial court, after having considered the pleadings and evidence presented in connection with a motion for summary judgment, summarized the positions of the parties as follows:
"Plaintiffs contend that they are proceeding under § 40-10-83, Code 1975, and that they are entitled to redemption of the property upon payment to the Defendants of such sums, and the interest thereon, as were paid by Defendants or their predecessors in title for the property and for taxes paid by them subsequent to the purchase. Defendants claim that under § 40-10-135, Code 1975, Plaintiffs must in addition pay to Defendants such sums as would be due to be paid to the Tax Collector during the time the State held title, had taxes been assessed during such time. Neither maintains that the taxes for such period should be paid to the Tax Collector. Under Plaintiffs' theory, Plaintiffs would redeem the property and escape payment of such taxes, absent the ability of the Tax Collector to `recapture' the taxes. Under defendants theory, such sums would be paid to and retained by Defendants. The Court does not believe that either result is correct."
The trial court then entered the following order:
"Judicial interpretation of § 40-10-83 has extended its operation somewhat beyond what might be concluded from a reading of the section. William R. Justice, in Redemption of Real Property Following Tax Sales in Alabama, 11 Cum.L.Rev. 331 (1980), says that, `The text of this statute sits, like a tip of an iceberg, atop a body of case law that transforms the section into an additional and distinct right of redemption.' That case law is summarized by Justice as follows:
"`In summation, the Supreme Court of Alabama has evidenced its inclination to support landowners against tax-sale purchasers by creating a method of judicial redemption while purportedly following the wishes of the legislature. An owner who has failed to redeem within three years of a tax sale may still redeem by bringing suit to quiet title despite the statute's requirement that the suit be against the owners, although the strict procedural requirements of bills to quiet title observed outside the realm of taxation are ignored. This is true whether the tax sale is valid or invalid, and is available without a time limit, provided two requirements are met. First, there must be no suit pending to enforce the purchaser's claim, despite a contrary statutory requirement. Second, though not mentioned in the statute, the purchaser must not have cut off *176 the owner's right by adverse possession.'
"The statute provides that the redemption amount is `the amount paid by the purchaser at the sale and of the taxes subsequently paid by the purchaser, together with six percent per annum thereon.' However, the construction of § 40-10-83 requires that the redeemer also pay the taxes which would have accrued:
"`His right to redeem under section 296, Title 51, Code [now § 40-10-83], assumes that the title passed out of complainant by the tax sale, and he is trying to reestablish it, dependent upon his possession, not necessarily peaceable possession. His right is not affected by his failure to pay the taxes while the title was in the State under the tax sale. If he can redeem at all, it is on the condition that such taxes be paid. * * *' [Emphasis added.] Standard Contractors Supply Co. v. Scotch, 247 Ala. 517, 25 So.2d 257 (1946).
"As interpreted, § 40-10-83 requires as a condition of redemption payment not only to the tax purchaser of the amounts paid by him, but also to the State of the amounts not collected by it. Therefore, in a proceeding under this section the subrogation provisions of § 40-10-135 are not applicable.
"To the extent that § 40-10-135 requires payment of the uncollected taxes to Defendants rather than the State, then such statute, together with § 40-10-134, would appear to run afoul of Art. IV, § 100, Constitution of Ala. 1901, which provides that no obligation or liability to the State shall `be exchanged or transferred except upon payment of its face value.' However, it is not necessary to reach the constitutional question for the reasons stated above.
"In the event that in further proceedings it is held that Plaintiffs are not required to pay the uncollected taxes to the State or to Defendants, the Court notes that Plaintiffs seek equitable relief. The Court alternatively finds as an equitable condition to redemption that Plaintiffs pay to the Tax Collector such taxes and all applicable penalties and interest.
"Summary judgment is granted in favor of Plaintiffs for redemption of the property described in the complaint upon payment to the Tax Collector of all taxes which accrued, or which would have accrued had Plaintiffs retained title, for the tax years 1979 through 1986, together with the interest and penalties thereon, less the amount paid by Defendants' predecessor in title to the State as consideration for the tax deed and any amounts paid by Defendants or their predecessor in title as ad valorem taxes subsequent to the receipt of the tax deed, and further conditioned upon payment to Defendants of all sums paid by Defendants or their predecessor in title to the State as consideration for the tax deed and of all sums paid by Defendants as ad valorem taxes subsequent to receipt of the tax deed, with the interest thereon. Title will be quieted and a final decree entered upon receipt of an affidavit establishing such payments."
Because of the importance of the issues presented, this Court granted oral argument in this case and also allowed the State Department of Revenue to file an amicus brief in the case, in which the Department asserts that, if the order of the trial court is affirmed, "the effect would be to severely curtail or perhaps, even prevent altogether, `best price' sales of properties held by the state for nonpayment of taxes."

I.
We believe it would be helpful to an understanding of the legal issues presented in this case to examine the history and procedure applicable to "best price" sales conducted by the State as authorized by Code of 1975, § 40-10-134.
When a tax collector of any county is unable to collect the ad valorem taxes that have been assessed against land located in the county, the probate court is empowered to order the sale of that land for the payment of the taxes assessed. Before a sale *177 can be made, however, the tax collector must report to the probate court of the county his inability to collect the tax without a sale of it. This requirement is necessary to ensure the validity of the sale. Code of 1975, § 40-10-1; State ex rel. Gallion v. Graham, 273 Ala. 634, 143 So.2d 810 (1962); Messer v. City of Birmingham, 243 Ala. 520, 10 So.2d 760 (1942).
The tax collector must give written notice to the taxpayer against whom the unpaid taxes have been assessed, either addressed to the taxpayer or to his personal representative or, if the taxpayer is a nonresident of the county, then by publication in a newspaper in the county. Code of 1975, § 40-10-6.
The taxpayer then has the opportunity to appear before the probate court to interpose any valid defense that the taxpayer may have against the sale of the land for the payment of the taxes, but, if none is made, the probate court is empowered to sell the property for the payment of the delinquent taxes. However, before this sale can take place, another notice, this one at least 30 days before the day of the sale, must be given. This notice must be published for three successive weeks in a newspaper in the county, or by posting a notice at the courthouse in which the land is situated. After this notice is published or posted, the sale is made in front of the courthouse of the county at public outcry to the highest bidder for cash. Code of 1975, § 40-10-11 through § 40-10-15.
If there is no purchaser for the land offered for sale at the courthouse steps, then the judge of probate must "bid in" the land on behalf of the State for the sum of the delinquent taxes, fees, charges, costs, and expenses of the sale. Code of 1975, § 40-10-18.
The judge of probate then makes out a certificate of purchase to the State and delivers it to the tax collector of the county. When the accounts of the tax collector have been settled by the comptroller, the comptroller delivers the certificate of purchase to the land commissioner. Lands bid in for the State are not assessed for ad valorem taxes until they have been redeemed or sold by the State, thus the effect of the purchases by the State of lands sold for delinquent taxes is to withdraw the land from further taxation until redeemed or sold by the State. Code of 1975, § 40-10-20; Downing v. City of Russellville, 241 Ala. 494, 3 So.2d 34 (1941).
The commissioner of revenue, as ex-officio land commissioner, has supervision and control of all real estate bought by the State at tax sales. He has the authority to rent, lease, and operate the lands generally, and also to sell the land. Pursuant to those duties, the Department of Revenue can "investigate sales of real estate for taxes bid in by the state, notify the parties at interest in such real estate or sales, secure redemption, sales or property, prevent waste," protect against trespassers, and generally look after the lands. Code of 1975, §§ 40-10-50, -52.
In order to prevent erroneous sales of land for taxes, the land commissioner is also charged with the duty of sending to the tax assessor of each county by August 1 of each year a descriptive list of all the lands in the county bid in for the State during the year prior to August 1 and not redeemed. The county tax assessor then must compare this list carefully with the record of sales of land for taxes in the county, and of the redemption thereof, and ascertain whether any of the lands have been redeemed or were not liable for the taxes for which they were sold. If there have been any erroneous sales, or if there have been lands that have been redeemed, the tax assessor then shall certify these facts to the land commissioner and the probate judge must correct the record of land sales in his office accordingly. Code of 1975, § 40-10-54.
When three years have passed from the date of the sale of the lands from the tax collector to the State, the land is subject to sale by the state land commissioner for a sum sufficient to cover and satisfy all claims of the State and county, which is a sum not less than the amount of money for which the lands were bid in by the State plus the "taxes due on said lands since date of sale." Code of 1975, *178 § 40-10-132. If there are lands that have been sold for taxes and bought for the State and not redeemed or sold by the State after a period of five years has elapsed from the date of sale to the State by the tax collector (the case here), then the land commissioner may sell the land for the "best price" obtainable, "irrespective of the amount of taxes due." (Emphasis added.) Code of 1975, § 40-10-134. But, before either type of sale by the land commissioner can be effected, the land commissioner must give written notice to the former owner informing him that an application has been made for the purchase of the land, and must give a reasonable time within which the former owner may redeem the land. Code of 1975, § 40-10-133.
Thus, at the time the land commissioner has determined that the land is going to be sold, the former owner of the land has received three noticestwo in writing and one by publicationinforming him that he has the right to redeem his property.
In its amicus brief, the State contends that the record shows that it has been difficult, if not almost impossible, for the State land commissioner to sell lands under § 40-10-132, because, the State argues, "a potential tax purchaser must pay all the taxes that were due on the lands at the time of the sale to the State, and all the taxes that have accrued from the date the land was bid in for the State to the date of sale by the State to the tax title purchaser," and because
"tax title purchasers are aware of the former owner's right of so-called `judicial' redemption under § 40-10-83. Because of this section, a § 40-10-132 purchaser [the case here] realizes that he, upon redemption by the former owner, can only require the former owner to reimburse him for what the taxes would have been had the former owner redeemed from the State (the price he has paid to the State), plus interest thereon at the rate of 6% per annum. The 6% interest rate provides an extremely small rate of return for what is sometimes a large, and always risky, investment."
There is evidence in the record that sales pursuant to § 40-10-132 have long been a problem for the State, resulting in a large inventory of lands bid in for the State, and that, in 1982, the Department of Revenue sought to address the problem of the extensive land holdings remaining on tax sale status for long periods of time with no production of revenue to the State. The record shows that to provide a solution to this problem, the Department of Revenue adopted a policy whereby lands that had been held by the State for more than five years would be sold "in bulk," in county-wide units through public advertisement for sealed bids, as provided for in § 40-10-134, "for cash at the best price obtainable." The State has the right to accept or refuse the highest bid. Although the mechanics of these "bulk sales" and the emphasis placed on them are different from those of prior years, the actual authority for the procedure, according to the State, "has been a part of the Code of Alabama since 1907. See, Section 2338, Code of Alabama of 1907, which is present § 40-10-134, Code of Alabama, 1975."

II.
The arguments of the parties and the State, as amicus, can be summarized, as follows:
The State and the tax purchaser contend that the "bulk sale" policy of the State is authorized by § 40-10-134, that it fosters a state policy of returning tax delinquent property to the tax rolls, that it is designed to discourage tax avoidance, and that it does not run afoul of a parallel state policy that provides a former owner of property a liberal right of redemption. They both argue that § 40-10-135 authorizes the tax purchaser, or his assigns, to require a former owner to pay to him a sum equal to "all the taxes due upon such lands, or that should have been under the law assessed upon the same, if they had been the property of a private citizen of the state," and that the statutory procedure is constitutional.
The former owners contend, on the other hand, that the governing case law provides *179 that a tax sale purchaser who has not paid to the State a sum at least equal to the taxes that would have accrued against the property had it been privately owned is not entitled to collect those taxes from the former owner upon redemption, and that, if § 40-10-135 is interpreted as urged by the tax purchaser and the State of Alabama, then § 40-10-135 violates Art. IV, § 100, Constitution of Ala. 1901.
Although the former owners believe they have a statutory right to redeem without paying the interim taxes to anyone, they do state that they "have no quarrel" with the trial court's order, which conditioned their right to redeem upon payment to the State of the interim assessed and unassessed taxes. Therefore, the only real issue in this case is whether the State, or the legislature, through § 40-10-135, can constitutionally assign to the "best price" purchasers the amounts the State would have otherwise collected had the property been sold to a private individual at the tax collector's sale (e.g., delinquent taxes, fees, charges, costs, and expenses of the sale, § 40-10-18), in addition to "the penalties and all of the taxes that [the State would have] under the law assessed," but for the necessity of its purchase of the land at the tax collector's sale. Section 40-10-135.

III.
By its express terms, § 40-10-135 assigns to the "best price" purchasers not only the taxes and penalties "that should have been ... assessed," but also "all the taxes due upon such lands," and further confers upon the "best price" purchasers "all the rights, liens, powers and remedies... [that] an individual purchaser at the tax collector's sale would have" against a redeeming party. These latter rights, etc., include the right to collect the delinquent taxes (i.e, those assessed but unpaid prior to the State's purchase), fees, charges, costs, and expenses of the sale (§ 40-10-18), all of which are really owed to the State. Clearly, since the "best price" purchasers did not pay to the State the face value of the amounts owed to it by the former owners, the assignment of these amounts, pursuant to § 40-10-135, violates Art. IV, § 100, Constitution of Ala. 1901, which unequivocally states:

"No obligation or liability of any person, association, or corporation held or owned by this state, or by any county or other municipality thereof, shall ever be remitted, released, or postponed, or in any way diminished, by the legislature; nor shall such liability or obligation be extinguished except by payment thereof; nor shall such liability or obligation be extinguished except by payment thereof; nor shall such liability or obligation be exchanged or transferred except upon payment of its face value...."
Whether the State can now collect from the redemptioners the unassessed taxes for the period between its purchase at the tax sale and the bulk sale more than five years later to the "best price" purchasers under § 40-10-135, is another matter. In the present case, the matter appears to be a nonissue, because the State is not seeking to collect these unassessed taxes. However, if they are at all collectable, they are collectable only by the appropriate taxing authority, not by a private individual, unless that individual is obligated, upon collecting them, to remit the taxes to the taxing authority.
Section 40-10-135 does more than merely provide a method of calculating the price that a former owner must pay to redeem land after it has been bought by the State and then sold for the "best price obtainable," pursuant to § 40-10-134. There is no mention in the statute of a purchase price upon redemption; rather it expressly confers upon the best price purchaser "on failure of his title ... all such liens and charges as the State had before such sale by the land commissioner." Because this statute is not susceptible to two constructions, we cannot uphold its constitutionality simply because its operation facilitates the return of land to the tax rolls by offering an incentive to "best price" purchasers to make a "risky" investment; that is, because, by its operation, if the property is redeemed by the former owners, the best *180 price purchasers are guaranteed to net more than a mere 6 percent interest per annum.
While the legislature may enact a statute requiring the former owners to pay to the State the delinquent taxes, etc., upon redemption from a "bulk sale" purchaser, under our constitution the legislature cannot assign the State's right to assess and collect those taxes to one who has not himself paid those taxes to the State.
Accordingly the judgment below is due to be, and it is hereby, affirmed.
AFFIRMED.
ALMON, SHORES, ADAMS and HOUSTON, JJ., concur.
TORBERT, C.J., and MADDOX, JONES and STEAGALL, JJ., dissent.
MADDOX, Justice (dissenting).
On its face, the majority opinion seems to be eminently correct, because § 100 of the Constitution of Alabama does say that "[n]o obligation or liability of any person, association, or corporation held or owned by this state ... shall ever be remitted, released, or postponed, or in any way diminished, by the legislature," and § 40-10-135 does provide that if the former owners of the property wish to redeem, they must pay to the purchaser at the state tax sale a sum equal to "all the taxes due upon such lands, or for which they were sold, and the penalties and all of the taxes that should have been under the law assessed upon the same, if they had been the property of a private citizen of the state." If § 40-10-135 actually assigned to the purchaser at the "bulk sale" the right to collect an "obligation or liability" of the former owners then I would agree that it would be unconstitutional. At the time the State sold the land at the "bulk sale" to the purchaser, there was no "obligation or liability of any person" which was due the State. The obligation or liability of the former owners to pay taxes on the land while they held legal title to it had been extinguished when the land was bought in by the State for the nonpayment of those taxes. There was no "obligation or liability" of the former owners to the State at the time the land was sold by the State to the purchaser at the "bulk sale."
The majority opinion correctly holds that "[l]ands bid in for the State are not assessed for ad valorem taxes until they have been redeemed or sold by the State, thus the effect of the purchases by the State of lands sold for delinquent taxes is to withdraw the land from further taxation until redeemed or sold by the State," citing Ala.Code 1975, § 40-10-20, and Downing v. City of Russellville, 241 Ala. 494, 3 So.2d 34 (1941).
The majority treats the taxes that were due and owing to the State before the land was bought in by the State as being a continuing obligation of the former owners, owed to the State, which could not be assigned. I believe that the obligation of the former owners to pay delinquent taxes was extinguished when the land was sold, pursuant to statutory authority, to the State for the nonpayment of those taxes. The majority recognizes that once legal title is in the State, the commissioner of revenue has control of it because he "has supervision and control of all real estate bought in by the State at tax sales," and it recognizes that "[h]e has the authority to rent, lease, and operate the lands generally, and also to sell the lands." 539 So.2d at 177. Nevertheless, the majority seems to think that the commissioner, if he sells the land, as he is authorized to do by § 40-10-135, must obtain a price equal to the amount of the delinquent taxes and the costs, etc., connected with the sale, even though the Legislature has specifically authorized him to sell the land for the "best price available" and has granted to a purchaser at such a sale the right to a lien.
I can find no reason why the Legislature is prohibited from allowing the commissioner of revenue to sell the land it has bought in for nonpayment of taxes and to fix the price at which the land will be sold, and imposing such conditions on the sale as it deems meet and proper. In fact, I believe that the Legislature, in order to foster the return of unproductive property to the State's tax rolls, had the power to authorize *181 what was done in this case. Consequently, I must respectfully dissent, and in my dissent I will trace the history of the various statutes and the reasons I believe the trial court erred.

I
As I view this case and the various contentions and arguments of the parties and of the State in its amicus brief, these questions are presented:
(1) Is the redemption price of a "best price" sale (§ 40-10-134) determined pursuant to the provisions of § 40-10-83, as the trial court held, or pursuant to § 40-10-135, as the tax purchaser contends?
(2) If the price is determined pursuant to the provisions of § 40-10-135, does that section violate Art. IV, § 100, of the Alabama Constitution, which prohibits the State from assigning to anyone its right to collect taxes?
In discussing these two issues, I begin by stating that I believe that the various statutes should be construed in pari materia, especially since each of the statutes deals with tax sales and the rights of the owners of property sold for taxes to redeem the property. Cf. State v. Chesebrough-Ponds, Inc., 441 So.2d 596 (Ala. Civ.App.1983), rev'd on other grounds, 441 So.2d 598 (Ala.1983); on remand, 441 So.2d 605 (Ala.Civ.App.1983) (statutes that deal with the same subject matter are in pari materia and should be construed together).
I am of the opinion that there are three sections of Alabama's 1975 Code that cover this controversy. They are §§ 40-10-132, -134, and -135.
Section 40-10-132 provides, in part:
"It shall be the duty of the land commissioner to cause to be prepared a suitable book, in which shall be entered a description, as accurate as can be obtained, of all the lands which have been bid in by the state, with the amount of state and county taxes due thereon and the date when such lands were bid in; and, when three years shall have elapsed from the date of the sale, such portions of lands as have not been redeemed shall be subject to sale by the state; and the land commissioner with the approval of the governor, may sell the same at private sale to any purchaser, who may pay therefor in cash to the treasurer such sum of money as the land commissioner may ascertain to be sufficient to cover and satisfy all claims of the state and county, which sum shall not be less than the amount of money for which the lands were bid in by the state, with interest thereon at the rate of six percent per annum from the date of sale, together with the amount of all taxes due on said lands since date of sale, with interest thereon at the rate of six percent per annum from the maturity of such taxes; provided, that if lands have not been redeemed or sold by the state within five years from the date of sale, such lands may be sold by the land commissioner as hereinafter provided. (Acts 1935, No. 194, p. 256; Code 1940 T. 51, § 315.)"
This section authorizes the land commissioner to sell all lands that the State has bid in pursuant to the provisions of § 40-10-18, as was the case here, after "three years have elapsed," to a private purchaser, who must pay the State all of the taxes which were due on the land at the date the State bought the land in at the tax sale, plus all taxes that have accrued after that date. This type of sale is sometimes referred to as a "full price" sale.
Section 40-10-134 provides:
"When lands have been sold for taxes and bought in for the state of Alabama and have not been redeemed or sold by the state and a period of five years has elapsed from the date of sale to the state, the land commissioner, with the approval of the governor, may sell the same at private sale to any purchaser for cash at the best price obtainable, irrespective of the amount of taxes due, after giving notice as provided for in section 40-10-133."
A sale conducted pursuant to this provision of the Code is generally referred to as a "best price" sale, and this sale can occur "[w]hen lands have been sold for taxes and bought in for the state of Alabama and *182 have not been redeemed or sold by the state and a period of five years has elapsed from the date of sale to the state" (emphasis added). In other words, if the State has not sold the land for the "full price" between the end of the three-year period and the end of the five-year period, then it may sell it for the "best price obtainable, irrespective of the amount of taxes due". § 40-10-134. (Emphasis added).
Section 40-10-135 details the rights of a purchaser at both a "full price" sale as authorized in § 40-10-132 and a "best price" sale as authorized by § 40-10-134. In fact, both §§ 40-10-132 and 40-10-134 are specifically mentioned in § 40-10-135:
"When lands have been sold by the state, as provided in sections XX-XX-XXX and XX-XX-XXX, and the purchase money has been paid, the land commissioner, in behalf of the state, shall execute to the purchaser a deed, duly acknowledged, without warranty or covenant of any kind on the part of the state, express or implied, conveying to him all the right, title and interest of the state in and to the lands purchased by him; and such purchaser shall thereafter have all the right, title and interest of the state in and to such lands and shall be held and treated as the assignee of all the taxes due upon such lands, or for which they were sold, and the penalties and all of the taxes that should have been under the law assessed upon the same, if they had been the property of a private citizen of the state, and he shall be clothed with all the rights, liens, powers and remedies, whether as a plaintiff or defendant, respecting said lands as an individual purchaser at the tax collector's sale would have in similar circumstances; and all such liens and charges as the state had before such sale by the land commissioner shall be enforced in favor of such purchaser from him, as under the provisions of law relating to individual purchasers at sales by the tax collector, such purchaser, on failure of his title, shall have his lien and charges assessed by the court or by a jury and may foreclose the same by proceeding at law in such suit. (Acts 1935, No. 194, p. 256; Code 1940, T. 51, § 318.)" (Emphasis added.)
The majority places great emphasis in the portion of the statute I have emphasized. I shall show why the majority incorrectly does so.

II
The former owners contend that the governing case law provides that a tax sale purchaser who has not paid to the State a sum at least equal to the taxes that would have accrued against the property had it been privately owned is not entitled to collect those taxes from the former owner upon redemption.
They also contend that the deed given to the defendants' predecessor in title shows that the consideration was $86.75, and that this Court has consistently held that a tax purchaser acquires a lien for the repayment to him only of the sums specified in the statutes by one who has a right to redeem. At issue is whether the tax purchaser, not having paid the State any sum to represent the taxes that would have accrued after the State acquired title, can require the former owner to pay that amount before he can redeem.
The former owners cite this Court's case of Chastang v. Moog, 230 Ala. 452, 161 So. 502 (1935), as authority for the proposition that a tax sale purchaser is not entitled to collect interim taxes from a redeeming former owner if the tax purchaser has not paid those taxes himself. Factually, Chastang is strikingly similar to this case and upon first examination would appear controlling. There, the tax collector sold the plaintiff's land in 1921 for unpaid 1920 ad valorem taxes. There was no purchaser at the tax collector's sale and the State bid in the property for the amount of the unpaid taxes plus costs. In 1926, the State sold the land to the defendant's predecessor in title. The purchase price did not include the taxes that would have been assessed against the property from 1921 through 1924 had it been privately owned during that time. When the plaintiffs filed a bill to quiet title and to redeem from the tax *183 sale, the defendant contended that she was entitled to collect those interim taxes, based upon the provisions of § 3123 of the 1923 Code of Alabama (now § 40-10-135, the statute that the tax purchaser relies on here, but with one very important difference § 3123 of the 1923 Code did not contain a reference to the "best sale" statute [§ 3122 of the 1923 Code, now § 40-10-134], as § 40-10-135 does; apparently, the compilers of the 1923 Code did not bring forward in the Code section the original language of Act No. 328, passed in 1919, as I will show later in this opinion).
In Chastang, this Court did hold, in part, as follows:
"The taxes on the land for the years 1921 to 1926 were not included in the purchase price, and the deed does not purport to vest in the purchaser from the State the right to demand the payment of taxes for said years by said purchaser or those claiming under her.
"There is no contention that the appellee, or those under whom she claims, had paid taxes on said property for the years 1921 to 1926, and therefore the case presented is not within the influence of Section 3123 of the Code [now § 40-10-135], but is governed by the provisions of Section 3096 [now § 40-10-70, Code of Alabama (1975) ], under which appellee is entitled to the taxes, fees, and costs for which the property was sold and paid to the State in the purchase by [appellee's predecessor], with the penalty provided by law, and the taxes subsequently paid by such purchaser and those claiming under said purchaser, with interest."
230 Ala. at 457, 161 So. at 506.
Chastang must be considered against the backdrop of the history of §§ 40-10-83, 40-10-134 and 40-10-135. Both §§ 40-10-83 and 40-10-134 first appeared in the 1907 Code, as §§ 2312 and 2338, respectively. Sections 40-10-132 and 40-10-135 appeared in the Alabama Code as early as 1897, and appeared in the 1907 Code as Sections 2323 and 2325, respectively.
It was not until the passage of Act No. 328 by the Alabama Legislature in 1919, that "best price" purchasers were granted all the right, title, and interest of the State, including the right to receive a full redemption from the former owner. However, when the Code of 1923 was compiled, "best price" purchasers, under § 3122 of that Code, were not included in the coverage of § 3123 (the 1923 Code version of present § 40-10-135). In other words, the benefit the Legislature had given to "best price" purchasers in 1919 by Act No. 328 was taken away by the 1923 Code.
The tax purchaser here contends that the failure of the compilers of the 1923 Code to include the benefit to "best price" purchasers was a "`historical' oversight of the first magnitude, committed by the compilers of the 1923 Code," and that the Legislature was quick to correct the error once it was discovered. On July 10, 1935, less than two months after the Chastang decision, the Legislatureprobably aware of that decisionpassed Act. No. 194, which amended § 3123 of the 1923 Code to extend its full coverage and benefits to both "full price" purchasers (present § 40-10-132) and "best price" purchasers (present § 40-10-134).
It is apparent that this Court, in Chastang, had to decide the issue presented there based on the law as it was stated in the 1923 Code, which was the applicable law in effect at the time the tax purchaser acquired her deed, and not based on the 1919 Act. Consequently, Chastang, although legally correct, is limited by its facts, and I do not believe that Chastang controls our interpretation of the law now applicable to the facts in this case.

III
The state land commissioner, in his amicus brief, strongly urges this Court to reverse the judgment of the trial court and argues that the record shows that the "bulk sales" policy has resulted in successively increasing yields since it was initiated, and that the department of revenue "has determined that the bulk sale of lands results in more net revenue for the state than the state would receive in trying to gain possession of the lands and attempting *184 to perfect its title, after allowing for the estimated expense of court costs, attorney fees, and additional administrative expenses."
Our decision cannot, of course, be based upon whether a particular policy is beneficial to the State or not, but must be based on what the Legislature, within the bounds of constitutional constraints, has actually authorized. By adopting § 40-10-134, the Legislature has authorized the land commissioner to sell certain lands for the "best price obtainable," and this record indicates that the land commissioner has determined that he can get the "best price" by selling parcels located in one county by using the "bulk sale" method. I believe he could do that constitutionally. The majority thinks otherwise.

IV
It is apparent that the Legislature has provided a procedure whereby land can be sold to pay the taxes due on the land, but adequate notice is required before such a sale can occur. As this record shows, at least 317 such sales occurred in Mobile County at which no purchaser entered a sufficient bid, and the 317 parcels were bought in by the State. At no time during the 5-year period set out in § 40-10-134 did any of the 317 former owners exercise their right to redeem from the State, as they were authorized to do.
The statutory scheme set up by the Legislature, under the facts of this case, allows the state land commissioner to sell the land for the "best price obtainable, irrespective of the amount of taxes due." According to the evidence in the record, one of the avowed purposes of the "bulk sale" policy was to carry out the legislative scheme of getting the land back on the tax rolls, either by sale or redemption. There is no suggestion in this record that the total price received by the State was not the "best price obtainable." The only argument centers around the assessed taxes, which I do not believe are the "obligation or liability of any person" under current law. The "bulk sales" were publicly advertised, and anyone, including the former owners, I must assume, could have entered a bid.
In any event, the following facts are uncontroverted: 1) the former owners failed to pay the ad valorem taxes on the property, 2) it was advertised for sale, and no purchaser having bid a sum to pay the taxes, fees, costs and expenses, it was bid in for the State, 3) while the State held the title for more than five years, no one, including the former owners, offered to buy or redeem the property for the "full price," 4) the land was included in a "bulk sale," along with 31 other parcels, and the tax purchaser, appellants' predecessor, bid the highest price, and was given a deed.
The Legislature has determined that, when land has been bought in by the State, and has been held for five years, and the state is not collecting any taxes on it, then the state land commissioner can sell the land for the "best price obtainable, irrespective of the amount of taxes due." The purpose is to get the land back on the tax rolls. Even redemption is a statutory right designed, in part, to get land back on the active tax rolls.
I can find no reason why the Legislature is prohibited from allowing the State, as the owner of the property, to sell it and fix the price, and impose such conditions on the sale as the State deems fit and proper. If the Legislature, in fostering the State's interest in returning unproductive property to its tax rolls, wants to grant to a purchaser the rights set out in § 40-10-135, I can find no constitutional provision that would limit the Legislature's power in that regard. Cf. State ex rel. Violet Trapping Co. v. Grace, 182 La. 405, 162 So. 26 (1935), aff'd, 297 U.S. 119, 56 S.Ct. 386, 80 L.Ed. 518 (1936).
If the law did not require that redemption take into account the taxes that would have been imposed had the property not been deeded to the State, owners might find it advantageous to allow their property to be deeded to the State with the intention of delaying redemption as long as possible to escape the taxes that attend ownership. The trial judge apparently recognized the inequity of allowing the former owners to *185 redeem without paying the taxes that would have accrued had the State not held legal title. He ordered that the former owners would have to pay all interim taxes to the State as a prerequisite to redemption. He cited no authority in support of his order. I cannot find any legislative authorization for the order, and the State does not seek to sustain it, even though it would mean that the State would receive the amount ordered to be paid. The majority treats the issue this way:
"Whether the State can now collect from the redemptioners the unassessed taxes for the period between its purchase at the tax sale and the bulk sale more than five years later to the `best price' purchasers under § 40-10-135, is another matter. In the present case, the matter appears to be a nonissue, because the State is not seeking to collect these unassessed taxes. However, if they are at all collectible, they are collectible only by the appropriate taxing authority, not by a private individual, unless that individual is obligated, upon collecting them, to remit the taxes to the taxing authority."
The State is of the opinion that when it received the "best price obtainable, irrespective of the amount of the taxes due," any obligation to the State had been extinguished. I am, too. In fact, the State supports the position taken by the appellants on this appeal.
Although the right of redemption is liberally granted, it is, nevertheless, a gratuity, and may be restricted in the discretion of the Legislature. Hill v. Di Beneditto, 253 Ala. 229, 43 So.2d 819 (1950).
Construing the statutes in pari materia, I am of the opinion that the Legislature, by adopting the various statutes, intended to accomplish at least these general objectives: 1) to give a former owner a liberal right to redeem, 2) to establish the price that the former owner would be required to pay in order to redeem, 3) to prevent "tax avoidance" by landowners, and 4) to foster a return of land to the active tax rolls. I believe that the decision in this case frustrates these objectives, and could foster tax avoidance.
Other jurisdictions deciding cases involving factual settings similar to the one presented here have recognized the State's interest in returning tax-delinquent property to the tax rolls as one of the paramount considerations, and the record here shows that this was one of the considerations that prompted the State to adopt the "bulk sale" policy. Typical of those cases is Sutter-Yuba Inv. Co. v. Waste, 21 Cal.2d 781, 785, 136 P.2d 11, 14 (1943), in which the court wrote:
"In the interest of returning tax delinquent property to the tax rolls, the State has enacted liberal provisions for the redemption of such property, so designed as to discourage tax avoidance. If they did not require that redemption take into account the taxes that would be imposed had the property not been deeded to the state, owners would find it advantageous to allow their property to be deeded to the state with the intention of delaying redemption as long as possible to escape the taxes that attend ownership, secure in the knowledge that the state must give them notice before disposing of the property. [Citation omitted.] The right of redemption until the disposal of the property by the state serves the taxpayer's convenience but does not enable him to escape taxes for the period intervening between the deed to the state and redemption while others pay their taxes conscientiously year by year. Likewise he cannot escape such taxes by allowing his property to be deeded to any other taxing unit such as a reclamation district and subsequently regaining the title free of intervening taxes." (Emphasis added.)
Sutter-Yuba Inv. Co. v. Waste, 21 Cal. 2d at 785, 136 P.2d at 14 (1943).

V
After considering the various statutes and the cases that interpret those statutes, and construing the statutes in pari materia, I am of the opinion that two central themes are always present: First, the statutes, and this Court's interpretation of them, extend to former owners whose land *186 has been sold for non-payment of taxes, very broad and expanded redemption rights; second, the redemption price is fixed at an amount that represents the amount of taxes, interest, and penalties the former owner has failed to pay, plus all taxes that would have accrued during the time the title was held by the State and no taxes were due or payable; third, tax titles may be acquired by two methods: a) by purchase at the tax sale conducted by the tax collector, or b) by subsequent purchase from the State, as is the case here.
The rights of purchasers at a tax collector's sale, including the State, are generally set forth in §§ 40-10-70 through 40-10-83. After the property has been bid in and the title is held by the State, as provided for by law, and the State sells that property as authorized by § 40-10-134, then §§ 40-10-129 through XX-XX-XXX control. Section 40-10-135 specifically controls the price that a former owner must pay to the purchaser from the State in order to redeem the property. This is the redemption price that the State has set, which the law says a former owner must pay in order to redeem; therefore, the decision of the trial court that § 40-10-83 was applicable and that principles of equity governed and required that a portion of the redemption price be paid to the State, is obviously erroneous.
The statutory scheme, which requires a former owner to pay all taxes due on the land, plus penalties and "the taxes which should have been under the law assessed upon the [property], if they had been the property of a private citizen," is not inconsistent with holdings made by this Court when this Court was construing the predecessor to § 40-10-83that was Title 51, Section 296, Code of Alabama 1940, the Code section relied upon by the trial court. In Standard Contractor Supply Co. v. Scotch, 247 Ala. 517, 25 So.2d 257 (1946), this Court recognized that a delinquent taxpayer cannot escape the payment of the taxes due and accrued:
"His [the landowner's] right to redeem under section 296, Title 51, Code, assumes that the title passed out of complainant by the tax sale, and he is trying to restablish [sic] it, dependent upon his possession, not necessarily peaceable possession. His right is not affected by his failure to pay the taxes while the title was in the State under the tax sale. If he can redeem at all, it is on the condition that such taxes be paid."

247 Ala. at 520, 25 So.2d at 259 (emphasis added).
Likewise, in Quinn v. Hannon, 262 Ala. 630, 634, 80 So.2d 239, 242 (1955), this Court again construed the predecessor statute to § 40-10-83, and held as follows:
"The effect of these sections is to place the purchaser in the shoes of the state, so to speak, giving to the purchaser whatever rights the state might have had if the sale had not been made. If the redemption here were from the state the amount to be paid would be the amount of money for which the lands were sold at the tax sale, with the statutory interest thereon from the date of the sale, there being no subsequent taxes due on the land."
It is apparent that this Court has not found the statutory scheme of putting a tax sale purchaser in the shoes of the State to be constitutionally infirm.
I now address the plaintiffs' contention that § 40-10-135 assigns to the defendants the right to "collect taxes" owed on the land, and that the statute thereby violates the provisions of Art. IV, § 100, of the Alabama Constitution. The parties have not cited, and my research has not revealed, an Alabama case on this point.
Of course, the Legislature is presumed to have acted constitutionally; therefore, "When an act is susceptible of two constructions, one of which would render it offensive to the Constitution and the other would not, the construction most favorable to the Constitution should be given though the less natural one." Centennial Associates, Ltd. v. Clark, 384 So.2d 616, 618 (Ala.1980).
I do not think that § 40-10-135 violates Art. IV, § 100, of the Constitution. Although I agree that the Constitution clearly prohibits the State from exchanging, transferring, or extinguishing obligations *187 due it, with certain exceptions, such an exchange or extinguishment is not contemplated by § 40-10-135. The statute merely provides a method of calculating the price that a former owner must pay to redeem land after it has been bid in by the State, and then sold to a third party. The statute, in pertinent part, states:
"When lands have been sold by the state as provided in § 40-10-134 the land commissioner shall execute to the purchaser a deed ... conveying to him all the right of the state in the lands ..., and such purchaser shall thereafter have all the right ... of the state ... to all of the penalties and all of the taxes that should have been under the law assessed." (Emphasis added.)
No transfer or exchange of obligation occurs under the statute. The Legislature could have provided any number of ways of calculating the price a landowner would have to pay to redeem land sold for non-payment of taxes. I would hold that the Legislature chose to provide that the redemption price was to be calculated, in part, with reference to the taxes that should have been assessed while the property was in the State's possession. Because the defendants in this case have not been assigned a tax obligation owed to the State, I find no constitutional problem. The redemption price, as properly calculated, would include the taxes that should have been assessed during the time the land was owned by the State, but the obligation of the former owners has been extinguished.
Of course, it would violate Art. VI, § 100, of the Constitution to assign the right to collect taxes actually assessed or to extinguish a liability for taxes actually assessed, but no taxes were assessed on this land while it was owned by the State. § 40-10-20. No taxes having been assessed on the land while it was in the State's possession, no argument can be made that a right to these taxes has been transferred. Likewise, the statute does not extinguish any obligations under this statute. The Constitution prevents the State from extinguishing an obligation except by payment of that obligation's face value, but where no taxes have been assessed, no obligation has been created.
The Legislature, in the interest of promoting the return of tax delinquent property to the tax rolls, has admittedly enacted liberal provisions for the redemption of that property, but it has also designed a scheme to discourage tax avoidance. Before the State can sell property under the "best price" statute, it must have held it for five years, during which time the State has not received any revenue, because "[l]ands bid in by the state shall not thereafter be assessed except as herein provided until the same have been redeemed or sold by the state." § 40-10-20. (Emphasis added.)
Because this case involves real estate that was sold for taxes and purchased by the State, I believe that the provisions of Title 40, Article 5, §§ 40-10-120 through XX-XX-XXX, apply, and that the Legislature acted constitutionally when it provided the amount that a tax purchaser could require a redemptioner to pay.
Based on the foregoing, I would reverse the judgment of the trial court.
TORBERT, C.J., and JONES and STEAGALL, JJ., concur.